UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
JAMMIN ENTERTAINMENT
COMPLEX et al.,

        Plaintiffs,

                              **MEMORANDUM & ORDER**
    v.                                    **07-CV-2342 (NGG)**

CITY OF NEW YORK et al.,

        Defendants.
----------------------------------------------------------X
GARAUFIS, United States District Judge.

        Plaintiffs run an entertainment venue called Cultural Performing Arts Center ("CPAC") that hosts reggae and other musical performances, in addition to being a "cultural performing arts center which hosts plays, wedding receptions, and political discussions relating to the Caribbean community in Brooklyn, New York." (Second Supplemental Affidavit of George Crooks in Further Support of Plaintiffs' Application for a Temporary Restraining Order and Preliminary Injunction ("Pls. Second Suppl. Aff.") at 1.) Plaintiffs have brought suit under 42 U.S.C § 1983 against the City of New York and nine members of the New York City Police Department ("NYPD") alleging a years-long campaign by the NYPD to harass and maliciously prosecute them through a series of events that includes Defendants' having ticketed Plaintiffs without justification, set up roadblocks to prevent the patrons from accessing the venue, and filed false charges against Plaintiffs. Plaintiffs claim that Defendants' "pattern of harassment has been with one goal in mind: to drive CPAC out of business and to prevent the peaceful assembly of primarily Black people and Black people from the Caribbean who wish to openly associate with each other." (Second Amended Complaint ¶ 12.)

        The court is now presented with Plaintiffs' application pursuant to Fed. R. Civ. P. 65 for

a temporary restraining order ("TRO") and preliminary injunction seeking to "1) enjoin the defendants from setting up any roadblocks at CPAC or in close proximity to CPAC without a legitimate or rational basis for doing so; and 2) enjoin defendants from preventing or discouraging patrons from attending any lawful events at CPAC." (Memorandum of Law in Support of Plaintiffs' Application for a Temporary Restraining Order and a Preliminary Injunction ("Pl. Mem.") at 2.)

For the reasons that follow, Plaintiffs' application for preliminary injunctive relief is DENIED in its entirety. Should future circumstances arise, such as establishment of sobriety or other roadblocks or other conditions that Plaintiffs believe improperly limit Plaintiffs in exercising their constitutional rights, they may reapply to the court for injunctive relief. Furthermore, the court directs that discovery be expedited and that particular attention be focused on, *inter alia*, the extent to which police presence and activities are the result of complaints and requests made by members of the community for intervention, such as 911 and 311 calls and community board and police community council meetings.

**I.     Background**

Plaintiffs are four individuals, George Crooks ("Crooks"), Danraj Appan ("Appan"), William Freeman ("Freeman"), and Tamisha Linsday ("Lindsay"), and a privately owned company called Jammin Entertainment Complex d/b/a Cultural Performing Arts Center ("CPAC") (collectively, "Plaintiffs"). Plaintiffs have brought this action against the City of New York and nine city employees in their individual capacities, none of whom are identified in the Complaint with their first names: Sergeant Abassi, Captain Nikas, Sergeant Burke, Officer Redmond, and John Does I through V (collectively, "Defendants"). Plaintiffs have brought suit

pursuant to 42 U.S.C. § 1983, alleging that Defendants "harassed and maliciously prosecuted them, falsely arrested and imprisoned them, maliciously abused criminal and civil process against them, violated their due process rights, violated their liberty interest rights, and maliciously violated their equal protection and commercial rights." (Plaintiffs' Second Amended Complaint ("2d Am. Compl.") ¶ 1.) Plaintiffs further allege that Defendants violated these rights because Plaintiffs are of "black Carribean heritage, national origin and alienage, and because CPAC's patrons are primarily of black Carribean heritage, alienage and national origin." (Id.)

Plaintiff Crooks, the general manager of CPAC, is identified as being of Jamaican national origin and alienage. (Id. ¶ 4.) Plaintiff Freeman, the sole owner of Jammin Entertainment Complex, which owns CPAC, is identified as African American. (Id. ¶ 5.) Plaintiff Appan, an independent promoter who at relevant times in the Complaint attempted to stage an event at CPAC, is identified as being of Guyanese national origin and alienage. (Id. ¶ 6.) Plaintiff Lindsay, a bartender at CPAC, is identified as being of Jamaican national origin and alienage. (Id. ¶ 7.)

Plaintiffs' Second Amended Complaint alleges in pertinent part as follows:

A.) In 2004, Jammin Entertainment Complex received a permit and license to host a reggae concert the night of January 1, 2005 at 10:00 p.m., extending into the early morning hours of January 2, 2005. (2d Am. Compl. ¶ 10(a).) Plaintiffs were given a Building Department permit for in-progress construction, a one-day temporary public assembly permit, and a one-day liquor license from the State Liquor Licensing Authority ("Liquor Authority"). (Id.) At about 2:00 a.m. on January 2, 2005, Defendant Abassi and other officers from the NYPD arrived at CPAC to inspect Plaintiffs' permits and licenses. Defendant Abassi instructed Defendant

3

Redmond to issue four tickets for warehousing alcohol, altering building construction, allowing on-premise alcohol consumption, and failing to have a certificate of occupancy ("CO"). (Id. ¶ 10(b).) These tickets were dismissed on February 16, 2005. (Id. ¶ 10(d).) Plaintiffs state that "[o]n information and belief, defendants have rarely, if ever, undertaken such actions against other establishments in Brooklyn that do not cater primarily to Black and Caribbean clientele, and which are not owned and operated by Black people from [the] Caribbean." (Id. ¶ 10(c).)

B.) One month later, Plaintiffs again applied for two one-day liquor licenses from the Liquor Authority, which were both denied because of a letter the Liquor Authority received from the NYPD "alleging that the venue was a 'focal point' of criminal activity." (Id. ¶ 10(e).) From March 2005 through July 2005, "police officers visited CPAC each night it was open for business and each visit interrupted business for 1 to 2 hours." (Id. ¶ 10(g).)

C.) In August 2005, Plaintiffs obtained a public assembly permit for a CPAC event to be held on August 21, 2005 (id. ¶ 10(h)), notified the local NYPD precinct weeks in advance (id. ¶ 10(i)), faxed copies of the permit and licenses to the precinct (id. ¶ 10(j)), met with a police officer from the Community Affairs Department on premises to give an examination of the permit and licenses (id.), and, three days before the event, escorted another police officer through the premises for a final walk through and inspection (id. ¶ 10(k)). Despite these steps, Defendant Abassi and a "team of police officers in trucks" visited CPAC and stated that "if the event was not cancelled, the promoter would be arrested and all the equipment would be seized," evidently because the event's promotional flyers contained "sparingly dressed women." (Id. ¶ 10(*l*).)

D.) Five months later, CPAC began to receive a flurry of tickets: (1) On January 1, 2006, officers issued a ticket citing disorderly premises, even though the club was closed at the time

4

(id. ¶ 10(m)); (2) On January 21, 2006, officers issued a ticket that was later dismissed for failure to display a liquor license, even though a license was fully displayed in a visible area (id. ¶ 10(n)); (3) On February 11, 2006, Defendant Redmond issued four tickets for disorderly premises, unreasonable noise, posting flyers illegally, and failure to have a liquor license (id. ¶ 10(o)); (4) On February 17, 2006, Defendant Burke instructed a Liquor Authority officer to purchase a beer and give the beer to an undercover officer posing as a minor, who then ticketed the bartender, Plaintiff Lindsay, for serving alcohol to a minor (id. ¶ 10(p)); and (5) On February 25, 2006, officers issued a ticket to Plaintiff Lindsay for serving alcohol to a minor. The drink was a mixture of orange and cranberry juices, and the ticket was dismissed on the merits (id. ¶ 10(q)).

E.) Furthermore: (1) In January and February 2006, officers set up roadblocks on all weekends CPAC was open and told customers the club was closed (id. ¶ 10(r)); (2) In May 2006, Defendant Redmond signed a false affidavit that CPAC was operating without a liquor license as part of a nuisance abatement claim (id. ¶ 10(s)); (3) On September 2, 2006, officers issued "bogus" tickets for disorderly premises and unreasonable noise, which were promptly dismissed (id. ¶ 10(t)); and (4) the NYPD filed charges with the Liquor Authority in a still-pending case to revoke CPAC's liquor license (id. ¶ 10(u)).

F.) The Second Amended Complaint goes on to allege further visits, disruptions and tickets by NYPD from September through December 2006. (Id. ¶¶ 10(v-y).) In one incident that is alleged by Defendants, officers expelled patrons, shut down the club and, when staff members refused to comply "citing failure by police officers to provide an order authorizing such a closure," the officers set up roadblocks and turned away potential patrons. (Id. ¶ 10(y).)

Plaintiffs allege that officers continued to ticket CPAC throughout the early months of 2007 (id. ¶ 10(z-aa)), threaten jail time to valet parking operators (id. ¶ 10(cc)), set up roadblocks to keep patrons away from CPAC (id. ¶¶ 10(dd-uu)), and pretextually tell patrons that the officers were part of an antiterrorism project (id. ¶ 10(gg)). Plaintiffs maintain that the roadblocks had the effect of "substantially reduc[ing] CPAC's business and profits as a commercial entity, and . . . prevent[ing] Black people from the Caribbean from assembly and associating with each other in a peaceful, but festive manner." (Id. ¶ 10(hh).) In another alleged February 2007 incident detailed in the Second Amended Complaint, Plaintiff Freeman, a part owner of CPAC, observed a van filled with police officers blocking the entrance to CPAC, and Defendant Nikas yelled at him, stating "Don't play games with me" and that officers were engaged in a "crime scene investigation." (Id. ¶ 10(*ll*).) As Plaintiff Freeman was walking away from Defendant Nikas, he heard Defendant Nikas tell Plaintiff Crooks, CPAC's general manager, that they "will be here every weekend." (Id.)

  G.) Plaintiffs allege that a campaign of harassment was continued against them in March and April 2007, when: (1) NYPD served CPAC with an Order to Show Cause for Nuisance Abatement in a case that was dismissed one week later, alleging that an eighteen-year-old female was served alcohol, which caused her to pass out, that an eighteen-year-old male was served alcohol, and that a bag of marijuana was found on the ground inside CPAC (id. ¶ 10(vv)); and (2) visits from NYPD officers continued (id. ¶ 10(ww)). Plaintiffs further allege that, on April 14, 2007, Plaintiff Appan, who was scheduled to run a disc jockey competition on which he had spent about $31,908.93 to advertise and promote, was approaching CPAC in a wheelchair and overhead police officers at a roadblock telling people that "there was no event tonight at CPAC."

(Id. ¶ 10(yy).)  The officer "angrily" told Plaintiff Appan that his job was to "keep everything civilized."  (Id.)  Plaintiff Appan's event was not held because "most of the patrons were turned away and there simply was not a crowd large enough to put on a show."  (Id. ¶ 10(zz).)

G.)  Finally, Plaintiffs allege that, in April and May 2007, NYPD "undertook a search of CPAC without any warrant whatsoever" (id. ¶ 10(bbb)), Defendant Burke falsely stated at a Community Board 17 Commerce Meeting that there were shootings inside of CPAC and that CPAC was a venue for underage drinking and crime (id. ¶ 10(ddd)), and officers ticketed Plaintiff Crooks for allegedly allowing an unlicensed security guard to work at CPAC (id. ¶ 10(eee)).

Plaintiffs filed a Complaint against Defendants on June 11, 2007 (Docket Entry #1), an Amended Complaint on June 28, 2007 (Docket Entry #3), and a Second Amended Complaint on July 12, 2007 (Docket Entry #4).  On July 12, 2007, Plaintiffs moved for a temporary restraining order and preliminary injunction requesting that the court: "1) enjoin the defendants from setting up any roadblocks at CPAC or in close proximity to CPAC without a legitimate or rational basis for doing so; and 2) enjoin defendants from preventing or discouraging patrons from attending any lawful events at CPAC."  (Pl. Mem. at 2.)  Plaintiffs argue that "[t]his requested relief does not impinge upon legitimate or legal police activity, but merely seeks to enjoin any further misconduct and harassment[.]"  (Plaintiffs' Notice of Application for a Temporary Restraining Order and Preliminary Injunction ("Pl. App.") at 2.)

On July 25, 2007, Defendants filed their opposition to Plaintiffs' motion for injunctive relief.  (City of New York's Memorandum of Law in Opposition to the Motion for Preliminary Injunctive Relief ("Def. Br.") (Docket Entry # 17).)  Defendants principally argue that Plaintiffs

7

are not entitled to what "is tantamount to a 'police-free zone,' particularly when that request encompasses an area that has been disproportionately plagued by a history of violent crime and quality of life violations in the recent past." (Id. at 2.) As they write:

> The City of New York maintains that the responses of the New York City Police Department . . . to calls of crimes, violence, and quality of life violations in and around CPAC have been, and will continue to be, lawful, necessary, based on probable cause, and undertaken in good faith. There has been no violation of plaintiffs' rights, or any misconduct on the part of the defendant City, that requires the extreme relief of a temporary restraining order or a preliminary injunction, nor is there any merit to plaintiffs' claims[.]

(Id.) Defendant City, in its response, outlined a statement of facts that details *inter alia* ten arrests at CPAC since October 29, 2005 – including arrests for loaded firearms, sale of marijuana, and assault – and other alleged criminal activity that has been the basis of eighteen complaints and seventy-eight 911 calls regarding CPAC since January 1, 2006. (Id.) Defendant City also reviewed various continued violations of alcohol control laws. (Id. (citing Declaration of Louise Lippin ("Lippin Decl.") ¶¶ 5-7).) Defendants argue that Plaintiffs have no standing to seek injunctive relief and cannot, in any event, show irreparable harm or likelihood of success on the merits.

The court held oral argument on Plaintiffs' application for a preliminary injunction on July 31, 2007, on which date the court granted Plaintiffs's request for additional time to file a supplemental reply affirmation in further support of their application. Plaintiffs filed their additional documents – consisting of three affidavits – on August 4, 2007. (Docket Entry #19.) Defendants filed their surreply with the court on August 7, 2007. (Docket Entries #20-22.)

## II. Analysis

### A. Standard for Injunctive Relief

"[T]he party seeking a preliminary injunction must establish that (1) absent injunctive relief, it will suffer an irreparable injury and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tips in favor of the movant." Hickerson v. City of New York, 146 F.3d 99, 103 (2d Cir. 1998). The likelihood-of-success standard (rather than the sufficiently serious question standard) applies whenever the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, which is in effect the situation in this case. Bery v. City of New York, 97 F.3d 689, 694 (2d Cir. 1996).

#### 1. Irreparable Harm

Plaintiffs state that they have demonstrated that CPAC lost community goodwill since event planners, promoters, investors and patrons are now reluctant to attend events or schedule events at CPAC. (Pl. Mem. at 16-17.) Plaintiffs further argue that CPAC's reputation is damaged as a result of "unchecked police misconduct." (Id.) To show irreparable harm, Plaintiffs must at a minimum show that they will suffer some injury as a result of actions that Defendants are continuing to take. See Brenntag Int'l Chems. Inc., v. Bank of India, 175 F.3d 245, 249-50 (2d Cir.1999) (Movant for injunctive relief must show that "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied.").

To support their irreparable harm argument, Plaintiffs cite to a number of Second Circuit cases for the proposition that loss of goodwill and damage to reputation may constitute

9

irreparable injury. (Id. at 16 (citing, e.g., John B. Hull, Inc v. Waterbury Petroleum Products, Inc., 588 F.2d 24 (2d Cir. 1978); Freedom Holdings Inc. v. Spitzer, 408 F.3d 112, 114-15 (2d Cir. 2005) ("[a]n anticipated loss of market share growth may suffice as an irreparable harm"); Jacobson & Co., Inc. v. Armstrong Cork Co., 548 F.2d 438, 445 (2d Cir. 1977) (plaintiff "presented ample evidence to show a threatened loss of good will and customers, both present and potential, neither of which could be rectified by monetary damages").) Plaintiffs argue that –

> No amount of monetary damages, as a matter of law, can recapture CPAC's disgruntled patrons or CPAC's reputation. Those patrons simply come less and less, and are understandably fearful of being stopped, searched, subjected to ID checks and turned away, even before they enter the venue.

(Pl. Mem. at 17.)

Defendants argue in response that Plaintiffs have not presented anything to support their claim that police enforcement activity at CPAC has resulted in a loss of goodwill within the community. (Def. Br. at 8.) Indeed, Defendants argue that the community has complained extensively about CPAC, and that it lacks a certain measure of community support to begin with. (Id.) Indeed, the City notes that most of the times that police officers are at CPAC, they are there in response to 311 or 911 calls from members of the community. (Id. at 9.)

Plaintiffs cite to Shain v. Ellison, 356 F.3d 211, 215 (2d Cir. 2004), a case in which the Second Circuit held that plaintiffs seeking injunctive relief must show that they have "sustained or [are] immediately in danger of sustaining some direct injury as the result of the challenged official conduct." The Shain Court noted that plaintiffs cannot rely on a past injury to show a likelihood that they might be injured in the future to satisfy the injury requirement. See also O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974) (holding that "[p]ast exposure to illegal conduct

10

does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects"). Furthermore, "[t]he injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" O'Shea, 414 U.S. at 494.

As Defendants point out, Plaintiffs have conceded that no checkpoints have been implemented near CPAC since April 2007. (Def. Br. at 6.) Defendants also have no knowledge that more are planned for the future. (Id.)

Defendants further argue that Plaintiffs lack standing to bring the action on behalf of their patrons. (Id.) In Powers v. Ohio, 499 U.S. 400, 410-411 (1991), the Supreme Court held that a litigant may bring an action on behalf of third parties only where "[t]he litigant . . . suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute . . ., the litigant [has] a close relation to the third party . . ., and [there is] some hindrance to the third party's ability to protect his or her own interests." Defendants argue that Plaintiffs cannot satisfy these elements because the patrons' alleged encounters with NYPD show, "if anything, only a perceived, attenuated injury to CPAC." (Def. Br. at 7.)

Both in their moving papers and in oral argument, Plaintiffs have failed to meet the standard for injunctive relief because they have not shown that they are immediately in danger of sustaining a direct injury as the result of the challenged official conduct. Shain v. Ellison, 356 F.3d 211, 215 (2d Cir. 2004) (internal citations omitted). They concede that there have been no police checkpoints at or near CPAC since April 2007, they present no evidence of any checkpoints planned for the future, and they cite only to allegations of past injuries. I further find their requests for relief to be vague and ambiguous. See, e.g., Pls. Second Suppl. Aff. of George

11

Crooks ¶ 4 (requesting that the court enjoin NYPD from setting up "illegitimate blockades around CPAC that [are] intended to deter patrons away from CPAC"). It may be that they can ultimately prevail on their underlying claims, but they simply do not meet the standard for injunctive relief at this time based on their argument that they will suffer any irreparable harm from future police roadblocks. A possible loss of community goodwill is simply not good enough, particularly when the evidence before the court implies, rather, that much of the police activity there has been a result of community complaints.

Further, regarding Plaintiffs' request that the NYPD refrain from telling people that CPAC is closed, I would note that immediately following the oral argument, Deputy Inspector William Aubry, who was present at the oral arguments, issued an internal memorandum to all 67th Precinct personnel directing officers of the precinct not to inform civilians that an establishment is closed when it is open, to get prior approval for any roadblocks, and to identify the reason for the roadblock in response to any inquiry. (See Defendant City of New York's Surreply Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunctive Relief at 7 (citing Memorandum of Deputy Inspector Aubry, annexed to Ciappetta Declaration).)

There is no evidence of future injury, and Plaintiffs have failed to satisfy their burden of showing irreparable harm.

### 2. Likelihood of Success on the Merits

The Second Circuit, in Plaza Health Labs, Inc. v. Perales, 878 F.2d 577, 580 (2d Cir. 1989), held that "where the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous fair-ground-for-litigation standard and should not grant the injunction unless the moving

party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim." See also Union Carbide Agricultural Products Co. v. Costle, 632 F.2d 1014, 1018 (2d Cir.1980), cert. denied, 450 U.S. 996 (1981); Medical Society of the State of New York v. Toia, 560 F.2d 535, 538 (2d Cir.1977).

Plaintiffs argue that Defendants have "significantly impinged on Plaintiffs' rights and the rights of CPAC's patrons to associate for social and cultural ends at CPAC." (Id. at 17-18.) As they argue, "[i]mplicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, religious, and cultural ends." (Id. at 18 (citing Roberts v. United States Jaycees, 468 U.S. 609 (1984).) Plaintiffs further argue that they have shown that "defendants are unable to demonstrate any probable cause or good faith basis for their continuing road blocks, searches and other interventions designed to deter CPAC patrons from visiting CPAC and associating with each other on CPAC's premises." (Pl. Mem. at 17.)

In response, Defendants first argue that vehicle checkpoints do not violate the Fourth Amendment and that "the checkpoints were established in locations in which there was a reasonable likelihood that people would be attempting to drive while under the influence of alcohol." (Def. Br. at 10.) Defendants also argue that the checkpoints were fairly administered and pursuant to a specific plan and therefore did not violate the Fourth Amendment. (Id. at 11.) Defendants argue that Plaintiffs' right to freedom of association was not curtailed since the checkpoints did not violate their right to freely associate with others for expressive purposes. (Id. at 12.) Defendant cites City of Dallas v. Stanglin, 490 U.S. 19, 25 (1989), in which the Supreme Court rejected the proposition that the First Amendment applied to patrons of a dance hall who

13

were "coming together to engage in recreational dancing." The Court wrote, "[W]e do not think the Constitution recognizes a general right of 'social association' that includes chance encounters in dance halls." Id.

Defendants further argue that Plaintiffs were not falsely arrested or falsely imprisoned since Plaintiffs were given summonses, which cannot be the basis of a false arrest claim. (Def. Br. at 14.) They argue that the issuance of an appearance ticket, such as a summons, "does not constitute confinement for purposes of a common law false arrest or false imprisonment claim." (Id. at 14-15 (citing Griffin-Nolan v. Providence Washington, 04-CV-1453, 2005 U.S. Dist. LEXIS 12902, *14 (N.D.N.Y. 2005).) Defendants finally argue that Plaintiffs failed to make a selective enforcement claim since their allegation that the City does not take similar enforcement actions against non-Black- or Carribean-owned establishments is conclusory (Def. Br. at 16), that Plaintiffs haven't made out a malicious prosecution claim (id. at 19), and cannot state a cause of action for abuse of process (id. at 23).

I agree with Defendants that Plaintiffs have not shown a likelihood of success on the merits. First, Defendants have argued that they had constitutionally valid reasons for these checkpoints. Any contention to the contrary by Plaintiffs that the sobriety checkpoints are pretextual, and that they are actually intended to close CPAC, is speculative. They are free to raise such an argument, of course, in the litigation itself, but at this point, they have simply not shown that the checkpoints violate the Fourth Amendment. Secondly, they have not shown that their own freedom of association was curtailed under Roberts or that they were engaged in expressive activity that is protected under Stanglin and its progeny. Third, Plaintiffs have not shown a likelihood of success on the merits of their false imprisonment claims due to the fact

14

that the claims rest on summonses and the allegation that patrons of CPAC who are not parties to this suit were stopped by police checkpoints. Finally, Plaintiffs' selective enforcement and malicious prosecutions claims are, at this point, entirely conclusory.

Thus, Plaintiffs have failed to show a likelihood of success on the merits.

### III. Conclusion

For the reasons set forth above, Plaintiffs' application for preliminary injunctive relief is DENIED in its entirety. As I previously ordered, Defendants have thirty days from the date of this order in which to answer the Second Amended Complaint or request a pre-motion conference. As noted above, should future circumstances arise, such as establishment of sobriety or other roadblocks or other conditions that Plaintiffs believe improperly limit Plaintiffs in exercising their constitutional rights, they may reapply to the court for injunctive relief. Furthermore, the court directs that discovery be expedited and that particular attention be focused on, *inter alia*, the extent to which police presence and activities are the result of complaints and requests made by members of the community for intervention, such as 911 and 311 calls and community board and police community council meetings.

SO ORDERED.

Dated: August 9, 2007　　　　　　　　　　　　　　　　　　　/s Nicholas G. Garaufis
　　　　Brooklyn, N.Y.　　　　　　　　　　　　　　　　　　　NICHOLAS G. GARAUFIS
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge